Good morning, Your Honors. May it please the Court, Avisa Gayala on behalf of Petitioner. This case presents the Court with several issues, including whether the immigration judge in the BIA erred in affirming the lower courts denial in Petitioner's request for relief pursuant to ACARA in finding that there was no ABC registration established on the record, and whether the BIA erred in affirming the lower courts denial of Petitioner's asylum of withholding a removal based on an adverse credibility finding and also the asylum claim itself in terms of persecution. Do we have jurisdiction over the NACARA issue? I believe so, Your Honor. Because it's not a discretionary finding, but it is a matter, it's a question of law in terms of the, it's a question of law whether the lower court, the BIA approved, affirmed, I'm sorry, without an opinion, so the Court would be reviewing directly the IJ's decision. And the question in that matter, the issue before the Court, would be a question of law and not of discretion. The case presents a situation where the judge failed to make an adverse credibility finding regarding the ABC registration, but nonetheless failed to credit the Petitioner's testimony, pointing to the lack of corroborating documentary evidence. He concluded that the Petitioner failed to satisfy the ABC registration requirement. But under this case, this Court's precedent in Chaley-Garcia v. U.S. 508, 5-3-1201, in 2007 the Court decided that ABC registration could be proven up with valid testimony from respondent, or in this case, Petitioner. Petitioner testified and related his testimony regarding ABC registration. A review of the record reveals that the Petitioner testified that she sought the assistance of a notary in preparing the ABC registration in 1989. And as of this date, nothing contradicts the record. There was no evidence filed. There was no adverse credibility finding in terms of that testimony. However, the I.J.'s decision, so the I.J.'s decision to reject the Petitioner's testimonial evidence because it lacked supporting documentation is unreasonable. And contrary to the established method by which these matters were litigated, and while contemporaneous documentary evidence may add to the credibility of the witness, it's not indispensable, specifically if prior case law in this case from this Court has established that. We are also requesting that the Court's decision to reject the Petitioner's testimonial evidence be rejected. I just want to make one comment. When the I.J. concluded that there was no evidence that she applied in a timely way, he discounted the fact that she testified that she did? Is that what you're saying? Yes, Your Honor. There was no adverse credibility finding to that. He does just he his ruling was based on the fact that there was no documentary evidence of the ABC registration. So you don't read it as a statement that he chose not to believe her testimony, but rather that he just discounted its existence? Exactly, Your Honor. And his decision was pretty clear that that's what he based it on, that although whether or not it was true that she or her testimony was true that she registered or went through the ABC registration, that she didn't submit any documentary evidence. And Chely Garcia, and that is why it's a question of law before this Court, because if the immigration judge didn't apply, Chely Garcia and the BIE in affirming without an opinion doesn't tell us whether or not that was that how that issue would have been brought up before that Court, allows for the testimony of the witness in terms of ABC registration to suffice the requirement under NACARA. So in that specific issue, what Petitioner is requesting is that the ‑‑ But if somebody is testifying that she registered with the government and she has no documents either of her own to show a registration form or from the government to show that they have a document of registration, why couldn't he just say, well, you know, this is something that is provable and you didn't prove it? Yes, Your Honor. That was what the facts were before in the Chely Garcia case, where in this type of ‑‑ in these type of cases where a lot of the respondents or in those asylum seekers were going to notary office or what are called offices that misrepresent themselves as attorneys. Notarians. Notarios, yes, Your Honor. Many of them don't ‑‑ didn't give receipts for registration, didn't give ‑‑ they don't follow up with anything that they do. They do charge the clients for what should be attorney representation and many times misrepresent themselves. Could you give me the citation for the case that you're relying on? I can't find it in your table of cases. Yes, Your Honor. It's Chely Garcia v. U.S., 508 F. 3rd, 1201, decided by this Court 2007. It's not in your blue brief. Is that right? That is correct, Your Honor. You didn't file a gray brief, so you've never filed it with us. You've never cited the test before. No, I did not, Your Honor. And prior to the Chely Garcia decision, USCIS did not view the filing of an affirmative asylum application. Counsel, can I just interject a minute? You sort of breezed by that. Excuse me? You just breezed by the fact that you hadn't cited this to us. Why do you think we get breezed? I understand, Your Honor. And why do you think we have a 28-J provision that allows you to bring to the Court's attention cases that you haven't cited so we can be alerted to them? Well, Your Honor, I was going to say. Essentially, we can't follow your argument. I mean, I didn't know what you were talking about, and now I know why I didn't know what you were talking about. The argument was made in the brief, Your Honor. The case was not cited. I didn't particularly write this brief. I was ‑‑ But you were preparing for this argument. Yes. You found the case. Yes. And you decided it was relevant. I did. And you decided to spring it on us during oral argument. Do you argue in front of us regularly? No, Your Honor. Is this your first time? Yes. Okay. So I understand that then. If you do come back, keep in mind that we read these briefs. We prepare heavily for these cases. We have eight cases on the calendar today alone. And if you don't give us your cases in advance, you have to stand there and use up your valuable time, as you've done now, explaining to us something that we're learning for the first time on the fly. That doesn't give you much time to argue your case. Do you understand what the problem is? Yes, Your Honor. Okay. And that is the argument in terms of ABC registration. In terms of the asylum claim, substantial evidence that I gave was that there was no substantial evidence to support the minor inconsistencies regarding dates on the application or the date of the initial asylum application. And the Petitioner's testimony, later testimony, that instead of being 1988, he had filed for asylum in 1990. The other one was based on the fact that the Petitioner did not know the date of the assassination of Jorge Carpio Nicoli, which was the Petitioner's employer when she was, as she stated in the record, in some form kidnapped by military officials and beaten. And there was a phrase named ñ Well, she didn't only not know. She didn't know. I mean, I don't put a whole lot of stock in flat dates, but she didn't know whether it was while she was in Nicaragua, or was it Nicaragua, Guatemala? Guatemala. Guatemala. Or when she was here. I mean, she didn't have a context for it. You'd think it would be a very important thing to her. Well, Your Honor, it is. Usually when something very important happens to you, you have some sense of where you were when you heard of it. Yes, Your Honor. I believe that the assassination of Jorge Carpio Nicoli was not at the heart of the matter of her claim because her claim was based on her affiliation to the UCM party, which at that time Jorge Nicoli was heading as president. But I thought she said she worked directly with him and for him. She worked directly with him under the party. She was an employee of the party. And so as an employee of the party, him being the president, she was directly ñ she had a direct nexus to him. But the matter ñ the heart of her claim was that through the nexus that she had to the party, these military officials came and interrogated her. And beyond that, that is the point where she received the beaten ñ But essentially he's testing her ñ the truth of her assertion that she worked with him and for him and thereby for the party by seeing whether she had some ñ how important this really was to her. Well, Your Honor, the type of questioning that the judge did was after the fact. He stated he requested information not about Jorge Carpio Nicoli himself, but about his assassination, which happened in 1993, well after Petitioner had been in the United States seeking refuge and after she had applied for asylum in 1989. She initially entered in 1988. So Petitioner is not linked to Mr. Jorge Carpio Nicoli in the sense ñ in any way linked to his assassination, but in terms of her role in the party and her nexus to him, that she received the persecution in the forms of beating. She's not ñ he was alleging that through her direct relationship through Mr. Nicoli, she suffered this persecution, where she wouldn't have to be reading the newspapers on a daily basis to see when the exact date of his assassination, if she heard of it well after or a little bit after in terms of the exact timing, doesn't go to the heart of the matter of her claim of her involvement in the UCN political party. And there's why Petitioner is alleging that although there is these two minor inconsistencies, the government needs much more than that to find ñ to have an adverse credibility finding where it must be based on, as this Court has stated before in Corden-Garcia, on cogent reasons which are substantially ñ My problem with this case is, so you're ñ if you're right, we send it back, and inevitably they're going to find that there were changed country conditions and she's going to lose. Is there any chance that's not going to happen, given the fact that I gather that these people are now in the government and so on? I understand that that will happen, Your Honor, but the ñ there was no ñ Petitioner was not given an opportunity to rebut any arguments made to either the BIA ñ to the BIA in terms of country conditions. Why wasn't she? Excuse me? Why wasn't she given the opportunity to rebut? Well, because at the time, Your Honor, not only was ñ the judge didn't bring that as the main rebuttal to ñ But she had to make her record, so she would have made whatever record she was going to make. Yeah, and I'm assuming you're referring to asserting future persecution in terms of establishing past persecution. But the minimum requirement of the court, the Supreme Court, and the judge cited in the brief in Cardoso-Fonseca, has established that even if the ñ if a court were to find that any of the situation that the petitioner suffered constituted persecution in any way, that one ñ you don't need not even a 50-50 percent chance that that is a probability on the petitioner's return to that country. The Supreme Court didn't ñ No, but you began by saying that she lacked some opportunity to make a record, and I don't understand why. No, Your Honor. I meant that the record wasn't clear, and I ñ I'll rephrase that, that the record wasn't clear in terms of the IG's analysis of how the country conditions ñ the changed country conditions in the same ñ And technically speaking, if we agreed with you, we would have to remand, I suppose, because the burn would be different. But it is something of a futile endeavor. Excuse me, Your Honor. It still seems like something of a futile endeavor, given the actual on-the-ground facts which she acknowledged. I understand that, Your Honor, but I believe that petitioner should be given the opportunity because that is the law as it stands now, that she be given that fair review of her case by the BIA and given a full analysis of these issues before the court. She wasn't given those explanations because of the court's decision without ñ the affirmance without the opinion. She did testify clearly and credibly at trial. There wasn't no ñ there wasn't a reasonable explanation of why those ñ the adverse credibility finding was cogent in any way or tied to the ñ and tied to the main argument in the petitioner's claim. So petitioner would ask that under Cardoza-Fonseca of the Supreme Court that in that even one in a ten chance of anticipated persecution occurring would suffice under the well-founded fear standard. In conclusion, taking in consideration these two ñ these two issues before the court and that the BIA lacked or didn't ñ didn't give an opinion or didn't give a reasonable explanation as to why it would sustain or affirm the lower court's opinion, the petitioner would ask for that opportunity that the case be remanded to the BIA, at least to give the petitioner the opportunity to bring these issues before the court. Kennedy. Did you handle this before the I.J.? Excuse me? Did you represent the petitioner before the I.J.? No, Your Honor. Who did? It's a ñ it's Mr. Ronzio's firm. Who? Ronzio and Associates. I'm not sure exactly. There was different attorneys on the matter. Starting from the master hearings to the merits, there's an array of different attorneys. I don't know if you want to see merits of the case, Your Honor. No, I'll just ask. Are you pro bono counsel or? No, Your Honor. I just ñ the firm asked me if I could come back and do oral argument. I see. For that firm? Yes.  Thank you. Because, you know ñ No other questions. There wasn't a Frank Ronzio? Didn't he start out on this case? I believe so, Your Honor. In the writing of the petition, I think there was another attorney on the petition and then Mr. Ronzio finished the case. Status quo. How many attorneys are there? I don't know how many attorneys they have now, Your Honor, but when I was there, it was approximately five and appearance attorneys as well. Can I ask you a cancellation issue? She had what? One American citizen child? That is correct, Your Honor. And several other children. Yes. And a grandchild who had serious problems and who she was basically caring for, but he was a child of a ñ With autism. I'm sorry, what? With autism. But he was a child of a non-American citizen child. That is correct, Your Honor. No further questions? No. Thank you. Thank you. Thank you. Do you know anything about the case that she was ñ oh, go ahead. Sorry. Amy Patterson for the government. Do you know anything about this case that she's talking about, about NACARA? No. No. Well, then you shouldn't have to argue about it, so I'm not going to ask you. Okay. I would like to address the NACARA issue that she raises. We don't believe that this is a question of whether the immigration judge failed to credit her testimony, but rather whether the testimony was sufficient to meet her burden. NACARA permits ñ Well, if that is the question, then we would have jurisdiction over it, wouldn't we? Yes, because it's a question of whether she meets the statutory requirements. Okay. And what happened in this case ñ You filed a 28-J letter on that issue, didn't you? Yes, I did. And that's the thrust of your 28-J letter? Yes. Okay. Thank you. That is correct. To demonstrate eligibility for NACARA, there's two different ways that she could demonstrate her eligibility. The first is by ABC registration, where she has to show that she entered before October 1, 1990, and that she properly submitted an ABC registration form on or before December 31, 1991. And the second way is via an asylum application that she shows was filed by April 1, 1990. In this case, although she offered some testimony regarding her interactions with Notario, she did not offer testimony that conclusively stated that she properly filed either of those applications in a timely manner. In her asylum application ñ That's why I surmise from this case, the mysterious case that we don't know anything about, that I thought the representation being made was that this case may say something about the fact that if she testifies that she tried to file it, that might be good enough. But I don't know because I don't have another case. Okay. Well, there's ñ there's two different ñ there's multiple sections of NACARA. And I don't know if this is the case that she's referring ñ if the case I'm about to talk about is the case that she's referring to or not. But there's some sections of NACARA, the sections at issue here. In Munas, the case that I filed a 28-day letter about, this Court held that NACARA is a statute of repose. So it's a closed class, and you have to properly have filed your applications by the deadline. And there's no statute of ñ it's not a statute of limitations, so there's no equitable tolling available. However, for other sections of NACARA, specifically the motion to reopen, in a later case, this Court found that for the motion to reopen requirement under NACARA, that it was a statute of limitations rather than a statute of repose, and therefore equitable tolling was applicable to that section. But for this ñ for these sections, it's a statute of repose, which means that it's a closed class. And the fact that for whatever reason she did not file in a timely manner, that there's no mechanism for the ñ for the Court to forgive that. When Congress wrote this particular section, it was actually ñ it was after the passage of ARERA. So it was ñ and they set the deadlines earlier. So the statute was written in 1997, but it was about paperwork that had been filed in 1990 and 1991. So what Congress was doing was they were creating this closed class, and the fact that she sought help but didn't actually file ñ manage to file that paperwork, even if it was through no fault of her own, unfortunately, in this case, doesn't change the outcome. Also, addressing the asylum ñ her application for asylum, withholding of removal and protection under the Convention Against Torture, the government does not view this as an adverse credibility case. Rather, the immigration judge made two specific findings. The first was that she did not suffer past persecution. The petitioner testified to one incident ñ one incident, and that she was kidnapped, held for a few hours, and beaten. There's no evidence of record regarding how severely she was injured. There's no testimony or medical record. Well, didn't she be beaten until she fainted? Yes. She said that she became unconscious, but, I mean, there's not ñ for example, there's not evidence suggesting that she suffered any sort of lasting damage or anything like that, or how severe her injuries were. And this Court has previously held that short detentions are ñ I'm having a hard time understanding why ñ do you think ñ it certainly reads like an adverse credibility finding, and I don't see anything in the I.J. opinion saying that ñ is there an alternative ruling that there wasn't ñ it didn't rise to persecution? Yes. On ñ if you look at page 85 of the record, the immigration judge says, ìI find that the Respondent has not established past persecution within the meaning of the Act.î It's well settled that a brief period of custody is not established. I see. Correct. And then ñ So in other words, but you're not trying to support the credibility finding. No. All right. Instead, we argue that the brief period that she was subject to interrogation is not sufficient to support a finding of past persecution because it was insufficiently severe. The immigration judge then went on to make ñ What did he base that on, insufficiently severe? Well, the ñ They take you into a prison, and she says she was a political activist in the 1980s. She was abducted by Guatemalan police, interrogated and beaten until she fainted. And she received death threats after the beating. In other cases, for the question of whether something is past persecution or not, the best methodology that we have is to go through the cases that this Court's already decided and do a comparison. In cases where this Court has found that there was not past persecution include instances of brief detentions, and she testified that she was only held for a few hours, single instances of physical abuse. But she also had death threats. And usually death threats alone aren't enough, but death threats with some evidence of past, at least whether it's persecution or not, but past incidents that could be part of a persecution claim seem to be enough. So why isn't the combination of one fairly serious incident and the death threats enough? If you're crediting everything. In this case, there's not really – in this particular case, these two, the death threats and this instance, aren't sufficient. But additionally, the immigration judge – You're saying that. I wonder why. I think you've faded yourself into a box because I.J. says, dismisses the death threats as not credible. But now you've said, well, they are credible. So you've got detention, beating, knocking unconscious, followed by death threats. So now you've got – what case are you distinguishing now from our past precedent? I appreciate the methodology. So is there somewhere we have said death threats plus severe beating are not good enough? I mean, I don't know offhand. I'm sorry, Your Honor. But I think that the – I think that looking at the rest of the immigration judge's determination in some ways takes care of that issue because the immigration judge went on to find that she did not have a well-founded fear of future persecution, which was based predominantly on the changes that have occurred in her home country. And you think it would make any difference if it went back with the burden of proof properly applied  I think that in this case, the facts are sufficiently clear that there would not be a change. But on the other hand, the government's been extremely rigid about the fact that we need to remand. And it seems to me that what's good sauce for the goose is good sauce for the gander in that instance. I mean, if this were on the other foot, you'd be insisting we had to remand. Well, I think that the agency has already made their opinion on this matter clear. And the immigration judge – No, it hasn't. It's made clear that she didn't prove it, but that's not the burden. Right. Well, he discusses the changed country conditions specifically in that the – in the incident that – this whole incident that was described by the Petitioner, the – her kidnappers were only interested in the whereabouts of her boss, Jorge Carquio, who has – who was assassinated in 1993. Additionally, the immigration judge pointed to – Can I ask a question? Yes. Is there any chance, given the current posture of this case, that we should set it off for mediation now and get it over with? I mean, it's a very sympathetic case because she has a grandchild with autism whom she's cared for and who seems to really be the one person who seems to be able to do something with him. And once – if the credibility determination is off the table, as a technical matter, we would almost surely have to remand. And then the question becomes, why don't we all go in – you guys go in a room and see if you can deal with this? I missed that last part of your question. Why don't they go and mediate it and get it done? Well, it's – I mean, it's – the granting and denial of relief is really up to the agency, so we don't really have authority. But you're not ruling it out? In other words, if we suggested it, you'd take it back to DHS and carry the message? I mean, of course I can – I can carry the message, but I – I mean, I can't. Do they shoot the messenger? On occasion. I thought that the agency – it was representation made by somebody in the agency – in the Justice Department that the former policy of saying we want the order and we'll worry about it later was not the policy anymore, and that there was some sort of prosecutorial discretion being exercised, including with regard to mediation. Is that not true? There is prosecutorial discretion. DHS has prosecutorial discretion in two places. The first place is to bring the charges. I'm talking about the – I'm talking about the Justice Department. The Justice Department doesn't really have any prosecutorial discretion. It lies with DHS. The DHS has – first, they've already decided to bring charges, and that's not a reviewable question. I mean, none of their prosecutorial discretion is reviewable. But additionally, they have – if the court were to affirm the removal order, the petitioner has the option of requesting on humanitarian grounds that her order not be executed, and DHS does have the prosecutorial discretion to agree to not execute a removal order, even if the removal order is otherwise legal and binding. And who applies for that? The petitioner can request that from the – from DHS. I mean – But sometimes this has been worked out through our mediators in a way that it doesn't have to drag on for five years. Right. But I think the unfortunate circumstances of this case are that she's admitted that she's removable and she has not met her burden of demonstrating that she's eligible for any form of relief. So while – But if we disagreed with you on the – credibility is off the table. We therefore have a persecution case with a severe beating, a relatively lengthy detention and death threat. And as far as I know – and you haven't given us a case in which that combination is not persecution. So really we're down to the question of future persecution in all likelihood. Well, the immigration judge did address the question of the well-founded fear of future persecution. Right. And now where there's past persecution, the – and I realize that there is some burden shifting between past persecution because past persecution gives us rise to a well-founded fear of future persecution versus just the – her failing to demonstrate that she has a well-founded fear of future persecution. However, the immigration judge noted that in 1996 there were peace accords that ended the civil war in Guatemala, which is the primary basis of her claim, and that she actually testified that she no longer is opposed to the government. She stated that her whole fear is because she believes that people who are opposed to the government, that the government harms them. But she also testified that she is no longer opposed to the government because the party that she was involved with now holds positions within the government. And because of that, she does not have a well-founded fear of future persecution and thus is ineligible for asylum. Just quickly, because you're out of your time, on what page is the discussion of well-founded fear? 86. 86? Yes. Unless the court has any other questions. We urge the court to deny the case. Hold on a second. Okay. So the IJ relies strictly on the changed government. Yes. The government has publicly accepted responsibility for Carpio's death, considering that other political changes since Respondent's departure in 1988, I conclude she has not shown a well-founded fear of future persecution. I, of course, assume that she had the burden, but presumably the political facts haven't changed. Okay. Thank you. Thank you. Madam, the government's rebuttal was predicated on the narrow fact in terms of the future persecution. The government noted incorrectly that the peace accords established a framework for civil integration in the country. However, that clearly isn't always the case when a peace accord is signed. There's still a lot of civil unrest that goes on after. Madam, is the government right about the Nicara issue? The what, excuse me? The Nicara issue. Your Honor, I understand that I didn't do what is the 28J letter. But is that case relevant to this statute of repose argument they're making, which is that the particular subsection they're dealing with does not allow for any tolling? So even if she is perfectly credible about having given this document to a notario to file, it doesn't matter? Your Honor, it exactly addresses, Shaley Garcia exactly addresses that because it pertains specifically to these type of cases. It's not just generally applied, but to ABC registration because of the circumstances in which most of these applications and these registration cards were filled. They were filled by notarios. Instead of taking up our time, what's the site again? Yes, Your Honor. And would you provide copies of the site to make sure that the government gets a copy? Yes, Your Honor. It's Shaley-Garcia-V-U-S-508-F3-1201. That's the Ninth Circuit, 2007. Can you repeat that, please? Shaley-Garcia-V-U-S-508-F3-1201. I thought I had 508. I thought I heard 2. F3-1201. 508. F3. 201. 1201.  And this case, Your Honor, addresses the point exactly. We'll read it, okay? Yes, Your Honor. It addresses the point exactly. In terms of the future persecution. We'll read it. We will read it. She's going after something else now. No. Addressing now. Oh, now you're talking about this case now, not that case. Yes, that case, Your Honor. Sorry. Okay. No. It's not whether the Petitioner will face a future persecution, but how well her fear is founded on based on the past persecution that she receives. So the question in this case is whether it is reasonable for a woman living. Objectively reasonable. Objectively. Objectively reasonable for a woman. Objectively. Objectively reasonable. Thank you, Your Honor, for a woman living in rural Guatemala in the midst of a country's civil unrest who was kidnapped and beaten by the military. Did she originally apply for asylum in 1989? Yes, Your Honor. And what happened to that? The asylum, together with the ABC registration, she didn't receive any response from the government. Because she did it through these notary offices, she didn't have the denial of the asylum. And then eventually she was put into removal proceedings, and then she applied for asylum again? Yes, Your Honor. That is correct. Say that again. She filed for asylum. As soon as she came in. And who handled that for her? They're called notarial offices. I know who they are. Believe me. I grew up in East L.A. I know what's going on. So what was the notarial's name? She didn't have that, Your Honor. She didn't have that information. So she went to a notarial. Yes. And where was the notarial located? Where he was... Where was his office? I don't have the exact address, Your Honor. I could go back to... But it's in the record. And then what did the notarial... The office later closed. Closed. Which is a usual habit of these cases. Yeah, they move on. Exactly. So I thought I heard you say that Notaria didn't file something timely. No, Your Honor. I did not. Yes, she did. She said that he didn't file the NACARA and he didn't file the asylum. That he didn't give her the proper documentation or copies of her application, and she later did not receive a denial of that application in the mail. Her testimony states that she later went to seek proof of the applications or receipt of a denial to that office with the people that she contracted to do the work for, and the office was no longer there. That is the testimony that she gave. And the implication is not that they didn't file it? Excuse me? Isn't the implication that they never filed it? That is the implication. Okay. However, that is why the case is clear about the testimony on its own in these type of cases. If there is no adverse credibility finding, it could suffice to meet that requirement. However, in this case, there was no adverse credibility finding, and at the same time, the judge is demanding documentary evidence, which in itself contradicts Cheney Garcia. And I do apologize for not having that case for you to speak on. But as to the asylum issue and how that ties into the fear of future persecution, is that if she had litigated all this when she thought she filed it, presumably there wouldn't have been changed circumstances and she would have gotten asylum and she'd be here? That is exactly right, Your Honor. It's just the time frame and unfortunate circumstances that led us to this. But, again, just to conclude. Does the immigration authorities have any copy of an application being filed back when? No, Your Honor. And that is exactly what the case addresses, where there is an implication that they don't have an asylum either. She just says she filed an asylum. That is correct, Your Honor. And they have no record of any filing? Yes. That is correct. And the notario is gone? No office, exactly. And given in the context, given all the petitioner's experience and information in this case. And meanwhile, she just lived her life. And then when did they finally get her notice to appear? I believe it was in 19- You have a sentence in mediation. 2002, Your Honor. She had previously filed an affirmative asylum application in 1994, again, when she found out that she did not have, that the government did not have- And that was denied? That's the one that was adjudicated now? Yes, that's the one that is going on now. So, in other words, the one that we're dealing with now was filed in 94? That is correct, Your Honor. But adjudicated 10 years later? Yes. If it had been adjudicated, why aren't we adjudicating it as of 94 in terms of jail? Well, because that's when the process started in terms of your time. All right. You are way, way, way over your time. Thank you. Thank you, Your Honor. What a mess.
judges: Pregerson, Fisher, Berzon